UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------X
RYAN DIPEDE and VIRGINIA JAMIESON,
individually and on behalf of their infant child A.D.,                    17 Civ. 1546 (PAC) (SN)

                                    Plaintiffs,                           **AMENDED**
                                                                         **COMPLAINT**

          -against-

JOSEPHINE McFARLANE, individually and as manager,                        **PLAINTIFFS DEMAND**
GLADYS CARRIÓN, individually and as Commissioner,                        **TRIAL BY JURY**
KAREN McNEELY, individually and as manager,
NADIA El-SAIEH, NAKIA WILLIAMS,
DERRICK HINDS, individually and as Deputy
Commissioner, KEITH HILL, EDEN HAUSLAIB,
individually and as director, GREGORY VINCENT, M.D.,
and CITY OF NEW YORK,

                                    Defendants.
-------------------------------------------------------------------------------X

          Adult plaintiffs and infant plaintiff, appearing by their attorneys, Lansner &

Kubitschek and Reibman & Weiner, hereby allege against defendants as follows:

                              I. PRELIMINARY STATEMENT

          1.        This is a civil rights action, pursuant to 42 U.S.C. §1983, in which

plaintiffs seek declaratory relief and damages to redress the deprivation, under color of state law,

of rights secured to them under the First, Fourth and Fourteenth Amendments of the United

States Constitution.  Plaintiffs also seek damages for the deprivation of their rights under New

York law.  The action arose from certain defendants' illegal seizure and continued detention of

infant plaintiff from adult plaintiffs without probable cause or due process of law, certain

defendants' interference with the liberty interest of adult plaintiffs and infant plaintiff in each

other's care, certain defendants' constitutionally inadequate, improper, negligent, and grossly

1

negligent autopsy, and certain defendants' malicious prosecution of adult plaintiffs in the New York Family Court.  State law pendent claims are also pleaded.

## II. JURISDICTION

2.      Jurisdiction is conferred upon this Court by 28 U.S.C. §1343, which provides for original jurisdiction over all actions brought pursuant to 42 U.S.C. §1983, and by 28 U.S.C. §1331, which provides jurisdiction over all cases brought pursuant to the Constitution and laws of the United States.  The Court has pendent jurisdiction over plaintiffs' state law claims pursuant to 28 U.S.C.§ 1367.

## III. PARTIES

3.      Plaintiffs Ryan Dipede and Virginia Jamieson reside in Brooklyn, New York, with their son, infant plaintiff A.D.

4.      Infant plaintiff A.D. was born in 2014.

5.      Defendant City of New York ("City") is a municipal corporation, incorporated pursuant to the laws of the State of New York.

6.      Defendant City's Administration for Children's Services ("ACS") is an agency/subdivision of the City of New York, which is authorized by New York State law to investigate reports of child abuse and neglect, remove children from their parents' custody, and to commence and continue child abuse and neglect proceedings against parents.

7.      In 2014 and 2015, defendant Gladys Carrión was the Commissioner of ACS, and is sued in her individual and official capacities.

8.      As Commissioner of ACS, defendant Carrión was responsible for making, approving, and implementing  policies for ACS, including policies regarding the investigation of

2

alleged child abuse or maltreatment, the removal and detention of children from their families, and the training and supervision of employees in ACS.  Upon information and belief, defendant Carrión personally participated in decisions regarding the removal of infant plaintiff from plaintiffs and the commencement and continuance of proceedings against the plaintiffs in the Family Court of the State of New York.

9.      As Commissioner of ACS, defendant Carrión was responsible for ACS's compliance with the Constitution, statutes, regulations, and common law of the United States and the State of New York.

10.      Upon information and belief, defendant Nakia Williams was employed during the years 2014-2015 by the City of New York as a child protective specialist for ACS.

11.      Upon information and belief, defendant Karen McNeely was employed during the years 2014-2015 by the City of New York as a child protective manager for ACS.

12.      Upon information and belief, defendant Nadia El-Saieh was employed during the years 2014-2015 by the City of New York as a supervisor for ACS

13.      Upon information and belief, defendant Derrick Hinds was employed during the years 2014-2015 by the City of New York as a deputy commissioner for ACS.

14.      Upon information and belief, defendant Josephine McFarlane was employed during the years 2014-2015 by the City of New York as a child protective manager for ACS.

15.      Upon information and belief, defendant Keith Hill was employed during the years 2014-2015 by the City of New York as an investigator for ACS.

16.      Upon  information and belief, defendant Eden Hauslaib was employed

during the years 2014-2015 by the City of New York as a director for ACS.

17.    Upon information and belief, defendant Gregory Vincent, M.D., was employed during the year 2014 as a medical examiner of the City of New York Department of Health and Mental Hygiene, an agency/subdivision of the City of New York.

<u>IV. FACTS</u>

18.    In 2014, infant plaintiff A.D. and his twin brother H.D. were born to adult plaintiffs.

**H.D.'s health problems during his short life**

19.    Both twins were premature and were medically fragile, especially H.D., who weighed less than three pounds at birth.

20.    H.D was in severe respiratory distress, and did not breathe for the first nine minutes of his life, and had other serious medical problems.

21.    Because of respiratory and other medical problems, both twins were placed in the neonatal intensive care unit of the Manhattan hospital where they were born.

22.    Infant plaintiff A.D., the stronger of the twins, was released from the hospital to the custody of plaintiffs when he was 40 days old.

23.    Because of both twins' fragile medical condition, plaintiffs hired two baby nurses, each of whom worked a 12-hour shift caring for the twins.

24.    H.D. remained in the hospital until he was 71 days old.

25.    When H.D. was released from the hospital, he was still very fragile and very small.

26.    After the twins' release from the hospital, adult plaintiffs and the two baby

nurses provided loving care for both twins.  Plaintiff Jamieson took a leave of absence from her job so that she could care for the newborns.

27.     Adult plaintiffs took both of their infants to the pediatrician for initial examinations, after the infants were released from the hospital.

28.     Four days after H.D.'s release from the hospital, at about 6:30 pm, adult plaintiffs left A.D. and H.D. in the care of the baby nurse who worked the night shift at their home and went out together for the first time since the birth of their twins.

29.     When adult plaintiffs left their home, both A.D. and H.D. were sleeping peacefully.

30.     Between 8:00 pm and 8:30 pm, the baby nurse fed H.D. and A.D., changed their diapers, and put them back to sleep at about 8:30 pm.

31.     At approximately 9:30 pm, the baby nurse checked both babies, and discovered that H.D. was not breathing.

32.     The baby nurse immediately called 911.  At the instruction of the 911 operator, the baby nurse administered cardio-pulmonary resuscitation to H.D., repeatedly squeezing his body and compressing his chest in an attempt to restart his breathing.

33.     The baby nurse's attempts were unsuccessful.

34.     When the emergency personnel arrived, they continued cardio-pulmonary resuscitation.  Then the emergency personnel transported H.D. to Woodhull Hospital, where hospital staff continued to perform cardio-pulmonary resuscitation, without success.  The protracted cardio-pulmonary resuscitation fractured several of H.D.'s ribs.

35.     Upon learning of the crisis, adult plaintiffs hurried home, arriving just as

5

H.D. was departing to Woodhull Hospital in an ambulance.  Adult plaintiffs followed in a taxi.

36.     Ten minutes after adult plaintiffs arrived at Woodhull Hospital, H.D. was pronounced dead.

37.     Doctors at Woodhull Hospital suctioned milk from H.D.'s mouth and trachea, and did not suspect any abuse or neglect.  The occurrence was reported to the State Central Register of Child Abuse and Maltreatment, which did not accept the case as a matter involving possible child abuse.

38.     Staff at Woodhull Hospital transferred H.D.'s body to the New York City medical examiner's office for an autopsy, with adult plaintiffs' permission.

39.     Upon information and belief, defendant City assigned defendant Gregory Vincent, M.D., to perform the autopsy on H.D.

40.     Defendant Vincent was an inexperienced pathologist, who had never previously performed an autopsy on an infant.

41.     Defendant Vincent lacked the qualifications to adequately and competently perform an autopsy on an infant.

42.     Defendant City of New York, defendant Vincent's employer, knew or should have known that defendant Vincent was not qualified to perform and adequate and competent autopsy on H.D.

43.     At the beginning of the autopsy, defendant Vincent noticed that H.D. had a small subdural hemorrhage, the age of which was unknown.

44.     Upon information and belief, based solely on the subdural bleed, defendant Vincent improperly decided that H.D.'s death was suspicious.  Defendant Vincent

6

jumped to the conclusion that H.D. might have been abused.

45.     Upon information and belief, defendant Vincent subsequently conducted the entire autopsy in a manner that would validate his preconceived opinion of child abuse, rather than to objectively evaluate all of the facts concerning H.D.'s health and death.  Inter alia, defendant Vincent ignored the fluid in H.D.'s lungs as a cause of death.

46.     In failing to properly conduct the autopsy, defendant Vincent substantially departed from the generally accepted standards of the medical profession.

**Child abuse investigation of adult plaintiffs and the removal of A.D.**

47.     Two days after H.D.'s death, when he had barely started the autopsy of H.D., defendant Vincent called the New York State Central Register of Child Abuse and Maltreatment and alleged that, at the relevant time on the date of his death, the baby nurse had been alone with H.D.; that the baby nurse had fed H.D. at about 8:30 pm; that the baby nurse had found H.D. unresponsive about an hour later; that the baby nurse had called 911 and started cardio-pulmonary resuscitation; that H.D. was transported to the hospital and pronounced dead at 10:30 pm; that an examination disclosed that H.D. had a subdural hemorrhage on his brain; and that a subdural hemorrhage is not typical for a child who was born premature with breathing issues, making his injury and death suspicious for child abuse.

48.     Said allegations of child abuse were false.

49.     Adult plaintiffs always provided loving care for H.D., and never abused or mistreated him or his brother A.D.

50.     The report was transmitted to defendant City's Administration for Children's Services, and, even though the allegations of suspicious injury and death did not relate

7

to plaintiffs, an investigator was assigned to do an emergency investigation and determine whether adult plaintiffs posed a danger to surviving infant plaintiff A.D.

51.     After visiting the home, and interrogating adult plaintiffs, the investigator determined that no intervention was needed to protect infant plaintiff A.D. from his parents. The investigator also learned that both baby nurses had stopped working for plaintiffs and were no longer caring for infant plaintiff A.D.

52.     The next day, defendant City's ACS reassigned the investigation to defendant Williams.

53.     Defendant City assigned defendant El-Saieh to supervise defendant Williams, and defendant McFarlane to supervise defendant El-Saieh.

54.     Defendant City also assigned defendants Hinds, Hill, Hauslaib, McNeely, and Carrión to participate in the investigation.

55.     At the beginning of the investigation, defendants Williams, El-Saieh, Hinds, McFarlane, Hill, Hauslaib, McNeely, and Carrión learned that, on the evening of H.D.'s death, the baby nurse who was on duty had fed both babies, changed their diapers, and put them to sleep after adult plaintiffs went out.

56.     During the investigation, defendants Williams, El-Saieh, Hinds, McNeely, McFarlane, Hill, Hauslaib, and Carrión learned from plaintiffs' neighbors that adult plaintiffs were good parents who provided exceptional and loving care to their babies.

57.     During the investigation, defendants Williams, El-Saieh, Hinds, McNeely, McFarlane, Hill, Hauslaib, and Carrión learned that plaintiff Jamieson's parents had come to stay with plaintiffs to assist adult plaintiffs in caring for A.D. while plaintiffs grieved.

8

58. Upon information and belief, during the investigation, defendants Williams, El-Saieh, Hinds, McNeely, McFarlane, Hill, Hauslaib, and Carrión learned that doctors at Woodhull Hospital who had cared for H.D. had not observed any traumatic injuries, had suctioned fluids from H.D.'s mouth and trachea, and did not suspect child abuse or neglect.

59. Upon information and belief, during the investigation, defendants Williams, El-Saieh, Hinds, McNeely, McFarlane, Hill, Hauslaib, and Carrión learned that the pediatrician for H.D. and A.D. concluded that neither baby had suffered from any trauma and that neither baby showed any signs of having been mistreated in any way.

60. During the investigation, defendants Williams, El-Saieh, Hinds, McNeely, McFarlane, Hill, Hauslaib, and Carrión learned from both H.D.'s pediatrician and a brain surgeon that subdural hemorrhages were typical in premature infants like H.D. and were not a sign of child abuse.

61. During the investigation, defendants Williams, El-Saieh, Hinds, McNeely, McFarlane, Hill, Hauslaib, and Carrión learned that H.D. had been born premature with many medical problems, some of which increased the risk of spontaneous bleeding, including subdural hemorrhages.

62. During the investigation, defendants Williams, El-Saieh, Hinds, McNeely, McFarlane, Hill, Hauslaib, and Carrión learned that H.D. had sustained rib fractures during prolonged cardio-pulmonary resuscitation, performed by the baby nurse and by hospital staff after H.D. had stopped breathing.

63. During the investigation, defendants Williams, El-Saieh, Hinds, McNeely, McFarlane, Hill, Hauslaib, and Carrión learned that none of the medical professionals connected

to H.D.'s case observed marks over H.D.'s ribs or under his arms, or damage to H.D.'s neck, all of which disproved assertions that H.D. had been held tightly or shaken violently.

64.     Despite all they had learned, five days after H.D.'s death, defendants Williams, El-Saieh, Hinds, McNeely, McFarlane, Hill, Hauslaib, and Carrión  removed A.D. from adult plaintiffs' custody and took him into the custody of defendant City, without ever having spoken to defendant Vincent or having obtained any information from defendant Vincent other than the summary of defendant Vincent's telephone call to the State Central Register.

65.     On the same day that A.D. was removed, defendants Williams, El-Saieh, Hinds, McNeely, McFarlane, Hill, Hauslaib, and Carrión filed a petition in the Family Court of the State of New York, seeking an order approving the removal of A.D from the custody of adult plaintiffs, his parents.

66.     The petition alleged that both adult plaintiffs and both baby nurses were responsible for causing the death and rib fractures of H.D., who allegedly had a "suspicious" subdural hemorrhage which purportedly was not typical of a child born premature, and that A.D.'s life was consequently in danger if he remained with adult plaintiffs.

67.     The allegations  were false and defendants Williams, El-Saieh, Hinds, McNeely, McFarlane, Hill, Hauslaib, and Carrión  knew or should have known that the allegations were false and could not be supported by competent evidence.  In addition, the petition omitted material information, i.e.,  that H.D. had died of natural causes related to his medical history and multi-system organ dysfunction, that subdural hemorrhages are frequent in premature babies and are not signs of child abuse, that H.D. was particularly susceptible to spontaneous bleeding, that H.D.'s rib fractures were caused by the cardio-pulmonary

10

resuscitation which had been attempted to save his life, and that H.D. was in the sole care of the baby nurse at the time of his death and for several hours before.

68.     Based upon the false information that defendants Williams, El-Saieh, Hinds, McNeely, McFarlane, Hill, Hauslaib, and Carrión provided, the Family Court judge ordered that A.D. not be released to adult plaintiffs and that A.D. should be placed in the custody of a friend of plaintiff Jamieson.

69.     Defendants Williams, El-Saieh, Hinds, McNeely, McFarlane, Hauslaib, Hill, and Carrión required that adult plaintiffs' visits to A.D. be supervised by A.D.'s custodian.

70.     Defendants Williams, El-Saieh, Hinds, McNeely, McFarlane, Hill, Hauslaib, and Carrión prohibited adult plaintiffs from staying overnight with A.D.  As a result, adult plaintiffs had to go to their own home every night, separated from their infant son.  Plaintiff Jamieson was unable to breastfeed her son during nighttime hours.

71.     Later, the Family Court judge allowed plaintiff Jamieson's parents to take custody of A.D., but continued to prohibit adult plaintiffs from being alone with their son, requiring plaintiff Jamieson to breastfeed A.D. under supervision.

72.     After hearing evidence from plaintiffs which refuted the charges, on November 6, 2014, the Family Court dismissed defendants' petition seeking the removal of A.D. from adult plaintiff, explicitly relying upon the material information that defendants had omitted from their application for removal.

73.     Later that same day, November 6, 2014, defendants Williams, El-Saieh, Hinds, McNeely, McFarlane, Hill, Hauslaib, and Carrión, without obtaining any new information, filed formal child abuse petitions against adult plaintiffs and against both baby

nurses in the Family Court, alleging that adult plaintiffs and the two baby nurses had fatally

abused H.D. and had "derivatively" abused A.D.

74.     Defendant Williams signed both petitions under oath.

75.     The allegations were false, and defendants Williams, El-Saieh, Hinds,

McNeely, McFarlane, Hill, Hauslaib, and Carrión knew or should have known that the

allegations were false and could not be supported by competent evidence.

76.     Defendants Williams, El-Saieh, Hinds, McNeely, McFarlane, Hill,

Hauslaib, and Carrión  made said allegations in reckless disregard of the truth and despite

knowing that the Family Court judge had already rejected the identical claims.

77.     Defendants Williams, El-Saieh, Hinds, McNeely, McFarlane, Hill,

Hauslaib, and Carrión made said allegations without legal justification or excuse.

78.     On November 7, 2014, based upon the allegations in the petition,

defendants Williams, El-Saieh, Hinds, McNeely, McFarlane, Hill, Hauslaib, and Carrión sought

an order removing plaintiff A.D. from the custody of his grandparents and placing A.D. into

defendants' custody.

79.     The family court judge denied said request, and instead released A.D. into

adult plaintiffs' custody pending the outcome of the case.  However, based upon the false

allegations, the Family Court judge allowed defendant City and its agents and employees to make

searches of plaintiffs' home and interrogations of adult plaintiffs whenever defendants chose to

do so, requiring plaintiffs to submit to repeated searches and interrogations at defendants' whim.

80.     Over the next thirteen months, adult plaintiffs were required to return to

the Family Court on approximately 20 occasions.

81.     Adult plaintiffs were required to retain separate attorneys to defend themselves in the Family Court.

**The autopsy**

82.     While the Family Court charges were pending, defendant Vincent continually delayed in conducting the autopsy of H.D.

83.     Defendant Vincent substantially departed from accepted professional standards in conducting the autopsy.

84.     Upon information and belief, in performing the autopsy on H.D., defendant Vincent failed to review H.D.'s medical records and failed to speak with all but one of the many doctors who had treated H.D.

85.     During the autopsy, defendant Vincent substantially departed from accepted standards of professional medical care and otherwise recklessly or intentionally destroyed portions of the body of H.D., including H.D.'s eyes and spinal cord, thereby precluding competent physicians from doing a second autopsy of H.D.

86.     Upon information and belief, the destruction of H.D.'s body caused by defendant Vincent caused and created spurious and/or misleading physical findings and artifacts that defendant Vincent then relied upon in forming his incorrect and improper opinions that had no other support.

87.     More than eight months after beginning the autopsy, defendant Vincent issued an autopsy report, concluding that H.D. had been a victim of a homicide caused by abusive head trauma.

88.     Said conclusion was false.

89.     No one had abused H.D.

90.     The adult plaintiffs had not abused H.D.

91.     Said conclusion was not supported by probable cause.

92.     Upon information and belief, defendant Vincent claimed that H.D. had been the victim of a violent shaking that caused his injuries and death.

93.     Upon information and belief, defendant Vincent knew or should have known that his theory of the manner of the alleged injury to H.D. would have immediately created an abnormal condition in H.D. that would not permit H.D. to feed from a bottle.

94.     Upon information and belief, defendant Vincent further concluded that the shaking which he alleged caused H.D.'s death had to have occurred after H.D. was fed and diapered at about 8:30 pm.

95.     Upon information and belief, defendant Vincent repeatedly informed defendants  Williams, El-Saieh, Hinds, McNeely, McFarlane, Hill, Hauslaib, and Carrión that the medical evidence showed that H.D. could not have been abused as alleged prior to about 8 or 8:30 pm on the night of H.D.'s death.

96.     Upon information and belief, the evidence that the adult plaintiffs were not in the home at the time of the alleged abuse was known or should have been known to all of the defendants.

97.     As a result of the evidence demonstrating that the adult plaintiffs were not in the home with H.D. at the time that H.D. allegedly was abused and fatally injured, the adult plaintiffs could not have caused H.D.'s death.

98.     Defendants Williams, El-Saieh, Hinds, McNeely, McFarlane, Hill,

Hauslaib, and Carrión accepted defendant Vincent's conclusion that H.D. had died as the result of a abusive head trauma, caused by abuse, and rejected all evidence demonstrating that the adult plaintiffs were not present at the time of the alleged abuse and injury to H.D.

99.     Upon information and belief, defendant Vincent repeatedly notified various personnel employed by the City of New York Administration for Children's Services that the adult plaintiffs could not been the person or persons who allegedly abused and injured H.D.

100.     Upon information and belief, defendants Williams, El-Saieh, Hinds, McNeely, McFarlane, Hill, Hauslaib, and Carrión possessed no evidence to contradict defendant Vincent's conclusion that H.D. had been fatally injured after adult plaintiffs left the home.

101.     Despite lacking probable cause to believe that adult plaintiffs had inflicted any injury upon H.D., and contrary to defendant Vincent's statements, defendants Williams, El-Saieh, Hinds, McNeely, McFarlane, Hill, Hauslaib, and Carrión continued the prosecution of adult plaintiffs in the Family Court.

**Police involvement**

102.     Upon information and belief, defendant Vincent and/or his agents notified the New York City Police Department that H.D.'s death was a homicide.

103.     The New York City Police Department began a criminal investigation against adult plaintiffs.

104.     Adult plaintiffs were required to hire a criminal defense attorney to represent them during the homicide investigation prompted by defendant Vincent.

105.     After the police department's investigation, the District Attorney did not charge adult plaintiffs with any crime.

15

**ACS's renewed attempt to separate A.D. from his family**

106.     A few days after receiving defendant Vincent's autopsy report, defendants Williams, El-Saieh, Hinds, McNeely, McFarlane, Hill, Hauslaib, and Carrión filed papers in the Family Court, seeking to remove A.D. from adult plaintiffs.

107.     Defendants Williams, El-Saieh, Hinds, McNeely, McFarlane, Hill, Hauslaib, and Carrión advised the Family Court that the medical examiner had concluded that H.D.'s death was a homicide.

108.     Defendants Williams, El-Saieh, Hinds, McNeely, Carrión, McFarlane, Hill, and Hauslaib, concealed from the Family Court the medical examiner's conclusion that adult plaintiffs had not been present when H.D. was purportedly shaken and therefore could not have shaken H.D.

109.     Defendants Williams, El-Saieh, Hinds, McNeely, McFarlane, Hauslaib, Hill, and Carrión concealed from the Family Court the opinions of the physicians who had treated H.D. during his life and examined H.D. after his death that H.D. had died of natural causes.

110.     The Family Court ordered a trial on the request to remove A.D. from adult plaintiffs and on the merits of the child abuse charges which defendants Williams, El-Saieh, Hinds, McNeely, McFarlane, Hill, Hauslaib, and Carrión had filed against adult plaintiffs.

111.     Adult plaintiffs were required to pay separate lawyers to defend them during the baseless Family Court proceedings.

112.     The trial took place on numerous occasions over nearly six months.

113.     At the trial, defendant Vincent testified that the shaking of H.D. had to

16

have occurred after H.D. was fed and diapered at about 8:30 pm, *i.e.*, after adult plaintiffs had left the home.

114.     Upon hearing said testimony, the Family Court dismissed all charges against adult plaintiffs.  The Family Court subsequently dismissed all charges against the baby nurses.  None of the defendants appealed from said orders of dismissal.

115.     Within 90 days of the events herein, plaintiffs timely filed a notice of claim and an amended notice of claim with the Comptroller of the City of New York.

116.     More than 90 days have elapsed since the filing of the notice of claim, and the City of New York has not resolved the claim.

### V. FIRST CAUSE OF ACTION

117.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 116.

118.     Upon information and belief, during the years 2014 and 2015, defendants City and Carrión had a policy and/or practice of removing and detaining children from parents who did not abuse, neglect, or endanger the children, without probable cause, without due process of law, and without constitutionally adequate investigations.

119.     Upon information and belief, defendants City and Carrión adhered to said policy even in cases where the evidence had ruled out some of the adults as possible perpetrators.

120.     Upon information and belief, in 2014 and 2015, defendants City and Carrión had a policy of charging all adults in a household with child abuse in cases where a child was suspected of being injured by a single adult, rather than investigating to determine which adult had inflicted the injury.

121.     Acting pursuant to said policy, defendants City, Carrión, Williams, Hinds,

McNeely, El Saieh, McFarlane, Hill, and Hauslaib removed and detained infant plaintiff from the custody of adult plaintiffs, and interfered with the relationship between adult plaintiffs and infant plaintiff, without probable cause and without due process of law, for nearly 15 months.

122.     Said policy and/or practice, and the removal and detention of infant plaintiff, constituted an unlawful seizure of infant plaintiff, in violation of the Fourth and Fourteenth Amendments to the United States Constitution.  Said policy and/or practice, and its implementation, were gross deviations from acceptable professional conduct.

123.     Said policy and/or practice, and defendants' deliberate removal of infant plaintiff from adult plaintiffs, constituted an unlawful interference with adult plaintiffs' liberty interests in the care and custody of their child, and their right to intimate association with their family, in violation of the First and Fourteenth Amendments to the United States Constitution. Said policy and/or practice, and its implementation, were gross deviations from acceptable professional conduct.

124.     Said policy and/or practice, and the deliberate removal and detention of infant plaintiff, constituted an unlawful interference with infant plaintiff's liberty interest in his family, and his right to intimate association with his family, in violation of the First and Fourteenth Amendments to the United States Constitution.

125.     As a result of all defendants' actions, adult plaintiffs suffered the loss of the custody of their child, the invasion of the privacy of their home and family, incurred legal and other expenses; the infant plaintiff suffered the loss of liberty and of the care and guidance of his parents; and all plaintiffs suffered humiliation, pain and suffering, terror, and mental anguish, all of which is ongoing.

18

## VI. SECOND CAUSE OF ACTION

126.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 125.

127.    Defendants City and Carrión provided grossly inadequate and unprofessional training and supervision to their agents and employees regarding:

a. investigating child abuse and neglect cases;

b. determining whether there exists probable cause to believe that continuing in the care of a parent presents an imminent danger to the child's life or health;

c. determining whether there exists probable cause to believe that returning to the care of a parent presents an imminent danger to the child's life or health;

d. determining whether there exists probable cause to believe that a parent has neglected or abused his or her child;

e. the provision of adequate notice and an opportunity to be heard prior to, or immediately after, the removal of a child;

f. the constitutional rights of parents and children in child abuse investigations;

g.  the rights of parents to be free from malicious prosecution of child abuse and child neglect;

h. determining which adult has abused a child when more than one adult is present in the child's household;

i. weighing conflicting medical information concerning the cause of a child's physical condition and/or injuries.

128.    Defendants City and Carrión knew or should have known that their

employees were improperly trained and supervised in said issues.

129.   Defendants City and Carrión knew or should have known that their employees would confront said issues in their work and that, without training, would make the wrong decisions on said issues.

130.   By reason of their lack of training and/or supervision, defendants Williams, El-Saieh, Hinds, McFarlane, Hill, Hauslaib, McNeely, and Carrión removed the infant plaintiff from the custody of adult plaintiffs.

131.   By reason of their lack of training and/or supervision, defendants Williams, El-Saieh, Hinds, McFarlane, Hill, Hauslaib, McNeely, and Carrión detained infant plaintiff from adult plaintiffs for a period of days, without adequate notice to plaintiffs, without adequate investigation, without probable cause, and without due process of law.

132.   By reason of their lack of training and/or supervision, defendants Williams, El-Saieh, Hinds, McFarlane, Hill, Hauslaib, McNeely, and Carrión, maliciously prosecuted adult plaintiffs in the Family Court for more than 14 months.

133.   As a result of all defendants' actions, adult plaintiffs suffered the loss of the custody of their child, the invasion of the privacy of their home and family, incurred legal and other expenses; the infant plaintiff suffered the loss of liberty and of the care and guidance of his parents; and all plaintiffs suffered humiliation, pain and suffering, terror, and mental anguish, all of which is ongoing.

## VII. THIRD CAUSE OF ACTION

134.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 133.

135.   Upon information and belief, from 2014 to 2015, defendants City and

Carrión had a policy or standard practice of commencing and continuing child abuse proceedings based on information that they knew, or should known, to be false or unreliable.

136.   Acting pursuant to said policy, in 2014, defendants Williams, El-Saieh, Hinds, McFarlane, Hill, Hauslaib, McNeely, and Carrión commenced and continued child abuse proceedings against adult plaintiffs based upon false, unreliable information.

137.   Acting pursuant to said policy, defendants Williams, El-Saieh, Hinds, McFarlane, Hill, Hauslaib, McNeely, and Carrión continued the prosecution of adult plaintiffs in the Family Court for approximately 14 months, after probable cause dissipated.

138.   Said defendants caused said charges to be commenced and continued willfully, maliciously, and without probable cause or legal justification or excuse, and for reasons other than to see justice done.

139.   Said defendants caused said charges to be filed and continued despite having no probable cause to believe that adult plaintiffs were guilty of child abuse or neglect.

140.   Said defendants caused said charges to be filed and continued with the intent to cause harm and injury to the adult plaintiffs and infant plaintiff, for the collateral objective of saving face and concealing their reliance upon an unqualified and incompetent medical examiner, and not for the protection of the infant plaintiff.

141.   In commencing and continuing said charges, defendants Williams, El-Saieh, Hinds, McFarlane, Hill, Hauslaib, McNeely, and Carrión, in gross and wanton disregard of adult plaintiffs' rights, violated adult plaintiffs' right to be free of abuse of process under the Fourth and Fourteenth Amendments to the United States Constitution.

142.   In the alternative, defendants City and Carrión failed to adopt any policies

for withdrawing child abuse proceedings in Family Court when probable cause dissipates.

143.    Defendants City and Carrión knew or should have known that their failure to adopt policies or standards would cause their employees to abuse government power by filing and continuing child abuse proceedings maliciously against parents and caretakers.

144.    In commencing and continuing said charges, defendants Williams, El-Saieh, Hinds, McFarlane, Hill, Hauslaib, McNeely, and Carrión, in gross and wanton disregard of adult plaintiffs' rights, violated adult plaintiffs' rights to be free of malicious prosecution under the Fourth and Fourteenth Amendments of the United States Constitution.

145.    As a result of all defendants' actions, adult plaintiffs suffered the loss of the custody of their child, the invasion of the privacy of their home and family, incurred legal and other expenses; the infant plaintiff suffered the loss of liberty and of the care and guidance of his parents; and all plaintiffs suffered humiliation, pain and suffering, terror, and mental anguish, all of which is ongoing.

## VIII. FOURTH CAUSE OF ACTION

146.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 145.

147.    In issuing the autopsy report and stating that H.D.'s was a homicide, defendant Vincent made deliberately false statements or recklessly disregarded the truth.

148.    Defendant Vincent's deliberate or recklessly false statements caused the other defendants to continue to prosecute plaintiffs in the Family Court without probable cause.

149.    The defendant City failed to properly and adequately train and supervise defendant Vincent.

150.    As a result of the City's failures with respect to defendant Vincent, the

22

autopsy was conducted in an improper manner that caused and created invalid findings, judgments and opinions by defendant Vincent.

151.    The invalid findings, judgments and opinions by defendant Vincent were a substantial cause of the malicious prosecution and other damages inflicted on plaintiffs.

152.    As a result of all defendants' actions, adult plaintiffs suffered the loss of the custody of their child, the invasion of the privacy of their home and family, incurred legal and other expenses; the infant plaintiff suffered the loss of liberty and of the care and guidance of his parents; and all plaintiffs suffered humiliation, pain and suffering, terror, and mental anguish, all of which is ongoing.

## IX. FIFTH CAUSE OF ACTION

153.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 152.

154.    In commencing and continuing child abuse proceedings against plaintiff in the Family Court, all defendants prosecuted plaintiff maliciously and without probable cause, in violation of the laws of the State of New York.

155.    As a result of all defendants' actions, adult plaintiffs suffered the loss of the custody of their child, the invasion of the privacy of their home and family, incurred legal and other expenses; the infant plaintiff suffered the loss of liberty and of the care and guidance of his parents; and all plaintiffs suffered humiliation, pain and suffering, terror, and mental anguish, all of which is ongoing.

## X. SIXTH CAUSE OF ACTION

156.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 155.

157.    By removing and detaining the infant plaintiff from plaintiff, all

23

defendants unlawfully interfered with adult plaintiffs' custody of their infant child, in violation of New York law.

158.    As a result of all defendants' actions, adult plaintiffs suffered the loss of the custody of their child, the invasion of the privacy of their home and family, incurred legal and other expenses; the infant plaintiff suffered the loss of liberty and of the care and guidance of his parents; and all plaintiffs suffered humiliation, pain and suffering, terror, and mental anguish, all of which is ongoing.

## XI. SEVENTH CAUSE OF ACTION

159.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 158.

160.    By removing and detaining infant plaintiff, defendants unlawfully imprisoned infant plaintiff.

161.    As a result of all defendants' actions, adult plaintiffs suffered the loss of the custody of their child, the invasion of the privacy of their home and family, incurred legal and other expenses; the infant plaintiff suffered the loss of liberty and of the care and guidance of his parents; and all plaintiffs suffered humiliation, pain and suffering, terror, and mental anguish, all of which is ongoing.

## XII. EIGHTH CAUSE OF ACTION

162.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 161.

163.    In removing infant plaintiff and detaining infant plaintiff, defendants violated infant plaintiff's right to be free of unlawful searches and seizures, protected by the Fourth Amendment of the United States Constitution.

164.    As a result of all defendants' actions, adult plaintiffs suffered the loss of

the custody of their child, the invasion of the privacy of their home and family, incurred legal and

other expenses; the infant plaintiff suffered the loss of liberty and of the care and guidance of his

parents; and all plaintiffs suffered humiliation, pain and suffering, terror, and mental anguish, all

of which is ongoing.

## XIII. NINTH CAUSE OF ACTION

165.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 164.

166.    All of the defendants had a duty to act with reasonable care toward

plaintiff and with the highest degree of care toward the infant plaintiff.

167.    Defendant City failed to properly hire, train, and supervise defendants

Carrión, Williams, McNeely, El Saieh, Hinds, McFarlane, Hill, Hauslaib, and Vincent.

168.    Defendants' removal and detention of the infant plaintiff constituted gross

breaches of said duty and gross deviations from accepted professional standards.

169.    As a result of all defendants' actions, adult plaintiffs suffered the loss of

the custody of their child, the invasion of the privacy of their home and family, incurred legal and

other expenses; the infant plaintiff suffered the loss of liberty and of the care and guidance of his

parents; and all plaintiffs suffered humiliation, pain and suffering, terror, and mental anguish, all

of which is ongoing.

**WHEREFORE** plaintiffs respectfully request that judgment be entered:

1. Declaring unconstitutional the policy of defendant City of charging all adults in

a household with child abuse when injuries have been inflicted upon a child by only one adult,

without investigating the identity of the actual perpetrator; and

2. Declaring unconstitutional the policy of defendant City of failing to consider

exculpatory evidence in determining whether to remove a child from a parent and prosecuting the

parent for child abuse in the Family Court; and

   3. Awarding adult plaintiffs and the infant plaintiff full and fair compensatory

damages as decided by the jury; and

   4. Awarding adult plaintiffs and the infant plaintiff full and fair punitive damages

as decided by the jury; and

   5. Awarding adult plaintiffs and the infant plaintiff interest from the date of the

removal of the infant plaintiff from adult plaintiffs; and

   6. Awarding adult plaintiffs and the infant plaintiff reasonable attorney fees

pursuant to 42 U.S.C. §1988; and

   7. Granting such other and further relief as this Court may deem just and proper.

Dated:  New York, New York
   June 29, 2017


  S/ Steven M. Weiner      S/ Carolyn A. Kubitschek
  Steven M. Weiner       Carolyn A. Kubitschek
  Reibman & Weiner       Lansner & Kubitschek
  26 Court Street, Suite 1808    325 Broadway, Suite 203
  Brooklyn, New York 11242    New York, New York  10007
  (718) 522-1743       (212) 349-0900
  sweiner@reibmanweiner.com    Ckubitschek@lanskub.com

Attorneys for plaintiffs

26